## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| TIFFANY ROPER and HEIDI EMMERLING, Individually, and on Behalf of All Others Similarly Situated, | ) ) ) ) | Case No. 1:23-cv-1836 Judge: Hon. Lindsay Jenkins Magistrate: Hon. Jeffrey Cole |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| RISE INTERACTIVE MEDIA & ANALYTICS, LLC | ) ) ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) ) | |

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs Tiffany Roper and Heidi Emmerling ("Plaintiffs"), through their undersigned counsel, bring this action against Rise Interactive Media & Analytics, LLC ("Rise" or "Defendant") pursuant to the investigation of their attorneys, personal knowledge as to themselves and their own acts and otherwise upon information and belief, and alleges as follows:

## INTRODUCTION

1.      Rise is a digital marketing firm that provides digital marketing for various companies, including an Ohio-based medical supplies company called RGH Enterprises, Inc. d/b/a Edgepark Medical Supplies ("Edgepark").

2.      On or about February 3, 2023, Rise announced to the HHS that it had been involved in a "Hacking/IT Incident" affecting 54,509 people[1] (the "Data Breach").  This hacking incident was a hack and exfiltration of Edgepark's customer information.[2]

---

[1] *See* https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf, last accessed March 22, 2023.
[2] *See* https://oag.ca.gov/system/files/Rise%20Edgepark%20Adult%20Notice%20Letter%20%2810959098x7A B84%29.pdf, last accessed March 22, 2023.

3.      Rise subsequently reported that this SPI included at least "patients' names, email addresses, phone numbers, provider information, diagnoses, expected delivery dates and health insurance information."[3]

4.      Plaintiff and Class members now face a present and imminent lifetime risk of identity theft, including theft of their health insurance information.

5.      The information stolen in cyber-attacks allows the modern thief to assume victims' identities when carrying out criminal acts such as:

- Filing fraudulent tax returns;
- Using your credit history;
- Making financial transactions on behalf of victims, including opening credit accounts in victims' names;
- Impersonating victims via mail and/or email;
- Impersonating victims in cyber forums and social networks;
- Stealing benefits that belong to victims; and
- Committing illegal acts which, in turn, incriminate victims.

6.      Plaintiffs' and Class members' SPI was compromised due to Defendant's negligent and/or careless acts and omissions and the failure to protect the SPI of Plaintiffs and Class members.

7.      As of this writing, there exist many class members who have no idea their SPI has been compromised, and that they are at significant risk of identity theft and various other forms of personal, social, and financial harm.  The risk will remain for their respective lifetimes.

8.      Plaintiffs bring this action on behalf of all persons whose SPI was compromised as a result of Defendant's failure to: (i) adequately protect consumers' SPI, (ii) adequately warn its

_____

[3] https://www.riseinteractive.com/getmedia/ac2bb6e3-99be-4d34-811f-8347d2c89630/EdgeparkData.pdf, last accessed March 22, 2023.

-2-

current and former customers and potential customers of its inadequate information security practices, and (iii) effectively monitor its platforms for security vulnerabilities and incidents (the "Class"). Defendant's conduct amounts to negligence and violates state statutes.

9. Plaintiffs and similarly situated individuals have suffered injury as a result of Defendant's conduct. These injuries include: (i) lost or diminished inherent value of SPI; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their SPI; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; and (iv) the continued and certainly an increased risk to their SPI, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the SPI.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

11. This Court has personal jurisdiction over Defendant because Defendant's principal places of business is located within this District.

12. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to these claims occurred in, were directed to, and/or emanated from this District. Defendant resides within this judicial district and a substantial part of the events giving rise to the claims alleged herein occurred within this judicial district.

## PARTIES

13.     Plaintiff Tiffany Roper is a natural person residing in the Greenwood County, South Carolina.  In mid-February 2023, Plaintiff Roper was informed by letter that she had been a victim of the Data Breach.

14.     Plaintiff Heidi Emmerling is a natural person residing in Madison County, Indiana. On or about February 5, 2023, Plaintiff Emmerling was informed via letter from Edgepark that she had been a victim of the Data Breach.

15.     Defendant Rise Interactive Media & Analytics, LLC. is a for-profit Delaware corporation with its principal place of business at 1 South Wacker Drive, Chicago, Illinois. Quad/Graphics, Inc. is a majority owner of Defendant.[4]

## FACTUAL ALLEGATIONS

16.     Defendant is a "full service digital marketing agency"[5] that serves numerous clients, including Edgepark.

17.     Defendant markets itself as a highly-sophisticated digital marketing and analytics company.  For example, of its web design (a key component of Defendant's business strategy), it states:

> We keep our finger on the pulse of customer behavior and our eye on the horizon of technology to develop tailored, effective web and mobile solutions that suit your needs and deliver delightful digital experiences for your customers across all devices and platforms. As a full stack development firm, our team can handle every aspect of the process, so you save time and money, with full visibility into each step.
>
> We're your full stack digital tailor, creating custom solutions to fit your specific needs—whether that's goal definition, business strategy, research, design and development, testing and optimization, measurement, and/or

---

[4] *See* https://biztimes.com/quad-graphics-paid-8-7-million-for-rise-interactive-majority-stake/, last accessed March 22, 2023.
[5] https://www.riseinteractive.com/about-rise, last accessed March 22, 2023.

> ongoing maintenance. As an expert web and app development company, we're passionate about using cutting-edge technology solutions to help brands communicate their product or mission to users across all devices and platforms. That means you'll get digital assets that are fully optimized from the day they launch and extends into tracking organic rankings, website performance, and additional KPIs to make sure we're achieving and exceeding customer expectations.[6]

18.     Defendant's self-professed technological savvy undergirds its entire website, which talks up the various services it offers to its clients, including paid search, SEO (search engine optimization), customer experience analytics, marketing measurements, and social media.

19.     Rise also holds itself out as "an expert in all things digital marketing, including social commerce."[7]

20.     In fact, Rise appears to do nothing *but* online marketing, analytics, and other forms of digital marketing that are solely directed toward driving online traffic for its customers.

21.     Rise even notes in its privacy policy that "Rise Interactive Media & Analytics, LLC. . .understands the importance of your privacy."[8]

22.     It is unclear from either Rise or Edgepark's statements or websites how Rise was given access to Edgepark's customers' health insurance information and other SPI as part of its digital marketing efforts, though it is extremely likely that Edepark is or was a client of Defendant's.  It is further unclear why Plaintiffs and Class members' health insurance information and SPI are necessary for Rise to engage in digital marketing on Edgepark's behalf.

---

[6]  https://www.riseinteractive.com/digital-customer-experience/web-mobile-dev-services, last accessed November 28, 2023.
[7]  https://www.riseinteractive.com/solutions/golden-ticket-to-social-commerce-success, last accessed November 28, 2023.
[8] https://www.riseinteractive.com/privacy-policy, last accessed November 28, 2023.

23.     In the ordinary course of doing business with Edgepark, customers provide Edgepark with patient SPI such as:

a.  Contact and account information, such as name, usernames, passwords, address, telephone number, email address, and household members;

b.  Authentication and security information such as government identification, Social Security number, security codes, and signature;

c.  Demographic information, such as age, gender, and date of birth;

d.  Payment information, such as credit card, debit card, and/or bank account number; and

e.  Medical history as self-reported by customers, or medical history as transmitted from healthcare providers;

24.     On or about February 10, 2023, Edgepark began sending out letters to patients and state attorneys general stating that "Rise informed us that it had identified a data security incident within its systems on November 14, 2022." Further, the letter said, "Rise learned that certain files may have been accessed or acquired as a result of this incident. On December 2, 2022, Rise identified that one of those files included Edgepark's patient information, provided to Rise in connection with its services."[9]

25.     Notably, neither Rise's notifications nor Edgepark's notification letters give greater specificity as to how this information was stolen nor what steps Rise has taken to prevent future use (including, importantly, why Rise was given HIPAA-protected information in the first place). Edgepark merely says, "Rise has assured us that it will continue to evaluate and modify its practices and internal controls to enhance the security and privacy of personal information."[10]

---

[9] https://oag.ca.gov/system/files/Rise%20Edgepark%20Adult%20Notice%20Letter%20%2810959098x7A B84%29.pdf, last accessed March 22, 2023.
[10] Id.

26.     Rise and Edgepark agree that the SPI involved included "your name, email address, phone number, provider information, diagnosis, expected delivery date and health insurance information."[11]

27.     The HHS lists relevant SPI protected by HIPAA as:

Protected Health Information. The Privacy Rule protects all "individually identifiable health information" held or transmitted by a covered entity or its business associate, in any form or media, whether electronic, paper, or oral. The Privacy Rule calls this information "protected health information (PHI)."[12]

"Individually identifiable health information" is information, including demographic data, that relates to:

    the individual's past, present or future physical or mental health or condition,
    the provision of health care to the individual, or
    the past, present, or future payment for the provision of health care to the individual,

and that identifies the individual or for which there is a reasonable basis to believe it can be used to identify the individual.[13] Individually identifiable health information includes many common identifiers (e.g., name, address, birth date, Social Security Number).[12]

28.     Edgepark, in particular, has had a history of prior data breaches, occurring in 2013[13], 2018[14], and 2019.[15]

29.     Of concern, while Defendant became aware of the Data Breach no later than November 14, 2022, it took approximately three months for Defendant to notify patients of customers and to publicly reveal the breach.

---

[11] *Id.*
[12] https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html, last accessed March 22, 2023
[13] *See* https://www.databreaches.net/edgepark-medical-supplies-notifies-patients-after-malware-may-have-compromised-their-personal-information/, last accessed March 22, 2023
[14] *See* https://www.databreaches.net/almost-half-a-million-breached-health-records-in-january-60-from-one-hacking-incident-alone/, last accessed March 22, 2023
[15] *See* https://www.databreaches.net/oh-edgepark-medical-supplies-notifying-6572-patients-after-a-password-spray-attack/, last accessed March 22, 2023.

30.     As a result, Plaintiffs' and class members' SPI was in the hands of hackers for approximately three months before Defendant began notifying them of the Data Breach.

31.     Defendant has offered no assistance to Plaintiffs or Class members in the wake of the breach.

32.     This response is entirely inadequate to Plaintiffs and Class members who now potentially face several years of heightened risk from the theft of their SPI and who may have already incurred substantial out-of-pocket costs in responding to the Data Breach.

33.     Edgepark does have a privacy policy on its website that states on its website that it may disclose HIPAA-protected information in conjunction with health care operations, stating:

> "For Health Care Operations:  We may use and disclose your protected health information for a variety of business activities that are called health care operations. For example, we may use protected health information to evaluate the performance of our staff in providing services and products to you or to work with others who assist us in complying with this Notice and other applicable laws.  Also, if you requested that we send order updates to your e-mail address, we may use and disclose protected health information for that purpose.[16]

34.     However, Rise is not, upon information and belief, in the business of providing health care operations.  It is a digital marketing firm.

35.     For marketing purposes, Edgepark states:

> Other uses and disclosures of medical information not included in this Notice or by laws that apply to its use will be made only with your written authorization, unless otherwise permitted by law.  For instance:
>
>     Marketing. We must obtain your permission prior to using your Protected Health Information for purposes that are considered marketing under the HIPAA privacy rules. For example, and except as described above, where we receive financial remuneration from third parties in exchange for communicating with you about certain products, services, treatments, therapies, health care providers, settings of care, case management, and care coordination, with your permission, we may use

---

[16] https://my.edgepark.com/PrivacyPolicy, last accessed March 23, 2023.

your Protected Health Information to provide you with these communications.[17]

36.     Plaintiffs and members of the Class did not so consent to having their SPI disclosed as part of the Data Breach.

37.     Defendant had obligations created by contract, industry standards, common law, and public representations made to Plaintiffs and Class members, to keep their SPI confidential and to protect it from unauthorized access and disclosure.

38.     Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches in the healthcare industry preceding the date of the breach.

39.     Indeed, data breaches, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known and completely foreseeable to the public and to anyone in Defendant's industry, including Defendant.

40.     According to the Federal Trade Commission ("FTC"), identity theft wreaks havoc on consumers' finances, credit history, and reputation and can take time, money, and patience to resolve.[18] Identity thieves use stolen personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank and finance fraud.[19]

---

[17] *Id.*

[18] *See Taking Charge, What to Do If Your Identity is Stolen*, FTC, 3 (Apr. 2013), https://dss.mo.gov/cd/older-youth-program/files/taking-charge-what-to-do-if-identity-is-stolen.pdf, last accessed March 23, 2023.

[19] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 CFR § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific

41.     The SPI of Plaintiffs and members of the Class was taken by hackers to engage in identity theft or and or to sell it to other criminals who will purchase the SPI for that purpose. The fraudulent activity resulting from the Data Breach may not come to light for years.

42.     Defendant knew, or reasonably should have known, of the importance of safeguarding the SPI of Plaintiffs and members of the Class, including dates of birth and other sensitive information, as well as of the foreseeable consequences that would occur if Defendant's data security systems were breached, including, specifically, the significant costs that would be imposed on Plaintiffs and members of the Class a result of a breach.

43.     Plaintiffs and members of the Class now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their SPI.

44.     The injuries to Plaintiffs and members of the Class were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the SPI of Plaintiffs and members of the Class.

45.     The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

46.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their networks' vulnerabilities; and implement policies to correct any security

---

person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id.*

problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

47. The FTC further recommends that companies not maintain SPI longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

48. The FTC has brought enforcement actions against businesses for failing to protect consumer data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

49. Defendant failed to properly implement basic data security practices, and its failure to employ reasonable and appropriate measures to protect against unauthorized access to consumer SPI constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

50. A number of industry and national best practices have been published and should have been used as a go-to resource and authoritative guide when developing Defendant's cybersecurity practices.

51. Best cybersecurity practices include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

52. Businesses that store personal information are likely to be targeted by cyber

criminals. Credit card and bank account numbers are tempting targets for hackers. However, information such as dates of birth and Social Security numbers are even more attractive to hackers; they are not easily destroyed and can be easily used to perpetrate identity theft and other types of fraud.

53.     The SPI of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[20]

54.     The FTC has released its updated publication on protecting SPI for businesses, which includes instructions on protecting SPI, properly disposing of SPI, understanding network vulnerabilities, implementing policies to correct security problems, using intrusion detection programs, monitoring data traffic, and having in place a response plan.

55.     General policy reasons support such an approach. A person whose personal information has been compromised may not see any signs of identity theft for years. According to the United States Government Accountability Office ("GAO") Report to Congressional Requesters:

[L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[21]

56.     Companies recognize that SPI is a valuable asset. Indeed, SPI is a valuable commodity. A "cyber black-market" exists in which criminals openly post stolen Social Security numbers and other SPI on a number of Internet websites. The stolen personal data of Plaintiffs and

---

[20] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs, last accessed March 23, 2023.

[21] *See* https://www.gao.gov/assets/gao-07-737.pdf (June 2007) at 29, last accessed March 23, 2023.

members of the Class has a high value on both legitimate and black markets.

57.    Identity thieves may commit various types of crimes such as immigration fraud, obtaining a driver license or identification card in the victim's name but with another's picture, and/or using the victim's information to obtain a fraudulent tax refund or fraudulent unemployment benefits. The United States government and privacy experts acknowledge that it may take years for identity theft to come to light and be detected.

58.    Among other forms of fraud, identity thieves may obtain driver licenses, government benefits, medical services, and housing or even give false information to police.  An individual may not know that his or her driver license was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud, or until the individual attempts to lawfully apply for unemployment and is denied benefits (due to the prior, fraudulent application and award of benefits).

## FACTS SPECIFIC TO PLAINTIFFS

59.    On or about February 15, 2023, Plaintiff Roper was notified via letter from Defendant that Plaintiff's SPI had been taken as part of the Data Breach.

60.    In very late December 2022 or early January 2023, Plaintiff Roper received word from her health insurance provider that someone had attempted to fraudulently fill a prescription using her health insurance.

61.    Additionally, since the time of the Data Breach, Plaintiff Roper has received numerous emails from various scammers attempting to get her to sign up for medical benefits and other scams.  This activity indicates that her information has been placed into the hands of hackers and has already been sold throughout the dark web.

62.    Plaintiff Roper has spent approximately 15 hours dealing with the fallout from the breach, including addressing the issue of the fraudulent prescription and attempting to stay ahead of the various scam and spam emails since the time of the breach.

63.     Further, Plaintiff Roper has experienced anxiety and increased concerns for the loss of her privacy since the time of the breach.

64.     Plaintiff Roper is aware of no other source from which the theft of her SPI could have come.  See regularly takes steps to safeguard her own SPI in her own control.

65.     On or about February 5, 2023, Plaintiff Emmerling was was notified via letter from Defendant that Plaintiff's SPI had been taken as part of the Data Breach.

66.     In February 2023, an unknown individual attempted to open a bank account in Plaintiff Emmerling's name, using, upon information and belief, information that was at least partly gathered from Plaintiff Emmerling's loss of SPI as a result of the Data Breach.

67.     While Plaintiff Emmerling was able to stop the opening of this account, she has had to be vigilant in ensuring that her SPI will not be further misused, including resetting passwords, putting freezes on her credit with the three major credit monitoring agencies, and keeping her payment cards locked unless actively using them.  These have required her to spend time that she would not have otherwise needed to spend in order to ensure that her information not be further misused.

68.     Plaintiff Emmerling has spent approximately 20 hours dealing with the fallout from the breach, including addressing the issue of the fraudulent prescription and attempting to stay ahead of the various scam and spam emails since the time of the breach.

69.     Further, Plaintiff Emmerling has experienced anxiety and increased concerns for the loss of her privacy since the time of the breach.

70.     Plaintiff Emmerling is aware of no other source from which the theft of her SPI could have come.  See regularly takes steps to safeguard her own SPI in her own control.

-14-

## CLASS ACTION ALLEGATIONS

71.     Plaintiffs bring this nationwide class action, pursuant to Rules 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, on behalf of all members of the following class:

> All natural persons residing in the United States whose SPI was compromised in the Data Breach announced by Defendant on or about February 3, 2023 (the "Nationwide Class" or "the Class").

72.     Additionally, Plaintiff Roper brings this class action pursuant to Rules 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedures, on behalf of all members of the following subclass:

> All natural persons residing in South Carolina whose SPI was compromised in the Data Breach announced by Defendant on or about February 3, 2023 (the "South Carolina Subclass" or "the Subclass").

73.     Excluded from the Class and Subclass are all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out, and all judges assigned to hear any aspect of this litigation and their immediate family members.

74.     Plaintiffs reserve the right to modify or amend the definitions of the proposed Class and Subclass before the Court determines whether certification is appropriate.

75.     **Numerosity**: The Class and Subclass are so numerous that joinder of all members is impracticable. Defendant has, as of this writing, indicated to the U.S. Department of Health and Human Services that the total number of Class Members is approximately 54,509.[22] The Class is readily identifiable within Defendant's records.

76.     **Commonality**: Questions of law and fact common to the Class and Subclass exist and predominate over any questions affecting only individual members of the Class and Subclass These include:

a.     When Defendant actually learned of the Data Breach and whether its response was

---

[22] https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf, last accessed March 23, 2023.

adequate;

b.      Whether Defendant owed a duty to the Class and Subclass to exercise due care in collecting, storing, safeguarding and/or obtaining their SPI;

c.      Whether Defendant breached that duty;

d.      Whether Defendant implemented and maintained reasonable security procedures and practices appropriate to the nature of storing the SPI of Plaintiffs and members of the Class and Subclass;

e.      Whether Defendant acted negligently in connection with the monitoring and/or protection of SPI belonging to Plaintiff and members of the Class and Subclass;

f.      Whether Defendant knew or should have known that it did not employ reasonable measures to keep the SPI of Plaintiffs and members of the Class and Subclass secure and to prevent loss or misuse of that SPI;

g.      Whether Defendant has adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

h.      Whether Defendant caused Plaintiffs and members of the Class and Subclass damage;

i.      Whether Defendant violated the law by failing to promptly notify Plaintiffs and members of the Class and Subclass that their SPI had been compromised; and

j.      Whether Plaintiffs and the other members of the Class and Subclass are entitled to credit monitoring and other monetary relief.

77.     **Typicality**: Plaintiffs' claims are typical of those of the other members of the Class and Subclass because all had their SPI compromised as a result of the Data Breach due to Defendant's misfeasance.

78.     **Adequacy**: Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class and Subclass. Plaintiffs' counsel are competent and experienced in litigating privacy-related class actions.

79.     **Superiority and Manageability**:  Under rule 23(b)(3) of the Federal Rules of Civil

Procedure, a class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Class and Subclass are impracticable. Individual damages for any individual member of the Class and Subclass are likely to be insufficient to justify the cost of individual litigation, so that in the absence of class treatment, Defendant's misconduct would go unpunished. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims. There will be no difficulty in the management of this action as a class action.

80.    Class certification is also appropriate under Rule 23(a) and (b)(2) because Defendant has acted or refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Nationwide Class as a whole and as the California Subclass as a whole.

81.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.    Whether Defendant owed a legal duty to Plaintiffs and members of the Class and Subclass to exercise due care in collecting, storing, using, and safeguarding their SPI;

b.    Whether Defendant breached a legal duty to Plaintiffs and the members of the Class and Subclass to exercise due care in collecting, storing, using, and safeguarding their SPI;

c.    Whether Defendant failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

d.    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach; and

e.    Whether members of the Class and Subclass are entitled to actual damages, credit monitoring or other injunctive relief, and/or punitive damages as a result of Defendant's wrongful

-17-

conduct.

### FIRST CLAIM FOR RELIEF
**Negligence**
**(By Plaintiffs Individually and on Behalf of the Class)**

82.     Plaintiffs hereby re-allege and incorporate by reference all of the allegations in paragraphs 1 to 81.

83.     Defendant appears to routinely handle SPI that is required of their customers, such as Edgepark.

84.     By collecting and storing the SPI of its customers' patients, Defendant owed a duty of care to the individuals whose SPI it collected to use reasonable means to secure and safeguard that SPI.

85.     As a company that contracts with medical service providers regularly, Defendant is aware of that duty of care to the SPI of its customers.

86.     As a company that routinely handles sophisticated online marketing efforts on behalf of customers, Defendant is also aware of that duty of care to its customers and their customers or patients.

87.     Defendant has full knowledge of the sensitivity of the SPI and the types of harm that Plaintiffs and Class Members could and would suffer if the SPI were wrongfully disclosed.

88.     Defendant knew or reasonably should have known that its failure to exercise due care in the collecting, storing, and using of their customers' SPI involved an unreasonable risk of harm to Plaintiffs and Class Members, even if the harm occurred through the criminal acts of a third party.

89.     Defendant had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to

unauthorized parties. This duty includes, among other things, designing, maintaining, and testing Defendant's security protocols to ensure that Plaintiffs' and Class Members' information in Defendant's possession was adequately secured and protected.

90. Defendant also had a duty to have procedures in place to detect and prevent the improper access and misuse of Plaintiffs' and Class Members' SPI.

91. A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Class Members was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

92. Plaintiffs and the Class Members were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew of should have known of the inherent risks in collecting and storing the SPI of Plaintiffs and the Class, the critical importance of providing adequate security of that SPI, and the necessity for encrypting SPI stored on Defendant's systems.

93. Defendant's own conduct created a foreseeable risk of harm to Plaintiffs and Class Members. Defendant's misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Defendant's misconduct also included its decisions not to comply with industry standards for the safekeeping of Plaintiffs' and Class Members' SPI, including basic encryption techniques freely available to Defendant.

94. As a sophisticated web-based company that routinely handles sensitive information, Defendant had a duty of care to Plaintiffs and Class Members.

95. Plaintiffs and the Class Members had no ability to protect their SPI that was in, and possibly remains in, Defendant's possession.

96. Defendant was in a position to protect against the harm suffered by Plaintiffs and

Class Members as a result of the Data Breach.

97.     Defendant had and continues to have a duty to adequately disclose that the SPI of Plaintiffs and Class Members within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and the Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their SPI by third parties.

98.     Defendant had a duty to employ proper procedures to prevent the unauthorized dissemination of the SPI of Plaintiffs and Class Members.

99.     Defendant has admitted that the SPI of Plaintiffs and Class Members was purposely exfiltrated and disclosed to unauthorized third persons as a result of the Data Breach.

100.     Defendant, through its actions and/or omissions, unlawfully breached its duties to Plaintiffs and Class Members by failing to implement industry protocols and exercise reasonable care in protecting and safeguarding the SPI of Plaintiffs and Class Members during the time the SPI was within Defendant's possession or control.

101.     Defendant improperly and inadequately safeguarded the SPI of Plaintiffs and Class Members in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

102.     Defendant failed to heed industry warnings and alerts to provide adequate safeguards to protect the SPI it had in its possession in the face of increased risk of theft.

103.     Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and Class Members by failing to have appropriate procedures in place to detect and prevent dissemination of the SPI of patients of its customers.

104.     Defendant, through its actions and/or omissions, unlawfully breached its duty to

adequately and timely disclose to Plaintiffs and Class Members the existence and scope of the Data Breach.

105.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and Class Members, the SPI of Plaintiffs and Class Members would not have been compromised.

106.    There is a close causal connection between Defendant's failure to implement security measures to protect the SPI of Plaintiffs and Class Members and the harm suffered or risk of imminent harm suffered by Plaintiffs and the Class. Plaintiffs' and Class Members' SPI was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such SPI by adopting, implementing, and maintaining appropriate security measures.

107.    Given Defendant's sophistication in the provision of online services and the potential likelihood of injury should it fail in its duties, the burden on Defendant to properly safeguard Plaintiffs' and Class Members' SPI would be relatively light.

108.    As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity of how their SPI is used; (iii) the compromise, publication, and/or theft of their SPI; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their SPI; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their SPI, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the SPI of its

employees and former employees in its possession; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the SPI compromised as a result of the Data Breach for the remainder of Plaintiffs' and Class Members' lives.

109.    Additionally, as a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have suffered and will suffer the continued risks of exposure of their SPI, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the SPI in its continued possession.

## SECOND CLAIM FOR RELIEF
### Invasion of Privacy Through Public Disclosure of Private Facts
### (By Plaintiffs Individually and on Behalf of the Class)

99.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 81.

100.    Plaintiffs and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential medical histories and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

101.    These sensitive confidential medical histories were caused to be given publicity by Defendant.

102.    Plaintiffs' and Class Members' confidential medical histories were private facts, and were not at any point intended for public dissemination.

103.    Disclosure of these private facts were offensive to Plaintiffs' and Class Members.

104.    Defendant owed a duty to those individuals whose information it had in its posession, including Plaintiffs and the Class, to keep this information confidential.

105.     The unauthorized acquisition (*i.e.*, theft) by a third party of Plaintiffs' and Class Members' SPI is highly offensive to a reasonable person.

106.     The intrusion was into a place or thing which was private and entitled to be private. Plaintiffs' and the Class disclosed their sensitive and confidential information to Edgepark as part of their treatment, but did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiffs and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

107.     The Data Breach constitutes an intentional interference with Plaintiffs' and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

108.     Defendant acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

109.     Defendant acted with a knowing state of mind when it failed to notify Plaintiffs and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

110.     Acting with knowledge, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiffs and the Class.

111.     As a proximate result of Defendant's acts and omissions, the private and sensitive SPI of Plaintiffs and the Class were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiff and the Class to suffer damages.

112.     Unless and until enjoined and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class

since their SPI are still maintained by Defendant with their inadequate cybersecurity system and policies.

113.    Plaintiffs and the Class have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard the SPI of Plaintiffs and the Class.

114.    In addition to injunctive relief, Plaintiffs, on behalf of herself and the other members of the Class, also seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest, and costs.

**FOURTH CLAIM FOR RELIEF**
**Violation of South Carolina's Data Breach Notification Act, S.C. Code § 39-1-90(B) *et seq*.**
**(By Plaintiff Roper Individually and on Behalf of the South Carolina Subclass)**

115.    Plaintiff Roper re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 81.

116.    Plaintiff Roper and the South Carolina Subclasses are residents of South Carolina.

117.    Defendant conducts business in South Carolina and maintains computerized data that contains the personal indentifying information of South Carolinians as defined under S.C. Code § 39-1-90(B).

118.    Defendant's disclosure of the Data Breach to Plaintiff Roper and the South Carolina Subclass were unreasonably delayed in violation of § 39-1-190(B).

119.    Pursuant to § 39-1-190(G), Plaintiff Roper and the South Carolina Subclass seek actual damages, injunctive relief, and reasonable attorney's fees and costs.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and all Class and Subclass Members,

request judgment against the Defendant and the following:

A.     For an Order certifying the Class as defined herein, and appointing Plaintiffs and their counsel to represent the Class;

B.     For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and the Class Members' SPI;

C.     For injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

    i.   prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

    ii.   requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

    iii.   requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the personal identifying information of Plaintiffs and Class Members' personal identifying information;

    iv.   prohibiting Defendant from maintaining Plaintiffs' and Class Members' personal identifying information on a cloud-based database (if, in fact, it does so);

    v.   requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct

testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vi.  requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

vii.  requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

viii.  requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

ix.  requiring Defendant to conduct regular database scanning and securing checks;

x.  requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiffs and Class Members;

xi.  requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in

-26-

response to a breach;

xii.  requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiii.  requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xiv.  requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xv.  requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xvi.  for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment; and

D.      For an award of damages, including actual, nominal, and consequential damages, as allowed by law in an amount to be determined;

E.      For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.      For pre- and postjudgment interest on all amounts awarded; and

G.      Such other and further relief as this Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED: November 28, 2023

Respectfully Submitted,

By: /s/ *Carl V. Malmstrom*
Carl V. Malmstrom
**WOLF HALDENSTEIN ADLER**
**  FREEMAN & HERZ LLC**
111 W. Jackson Blvd., Suite 1700
Chicago, Illinois 60604
Tel: (312) 984-0000
Fax: (212) 686-0114
malmstrom@whafh.com

*Attorney for Plaintiffs and*
*the Putative Class*